McDONALD, Commissioner of Agriculture, et al. v. H. ROUW CO. et al.

No. 9562.

Court of Civil Appeals of Texas. Austin.

May 15, 1946.

Rehearing Denied June 5, 1946.

Grover Sellers, Atty. Gen., and L. H. Flewellen and George W. Barcus, Asst. Attys. Gen., for appellants.

Sid L. Hardin, of Edinburg, and Taylor, Cox, Wagner & Taylor, and V. W. Taylor, all of Brownsville, for appellees.

BAUGH, Justice.

This suit was originally filed in the District Court of Cameron County by appellees, growers and/or dealers in citrus fruit in the Rio Grande Valley, against the Commissioner of Agriculture and his chief citrus fruit inspector, seeking to set aside as invalid a so-called directive of the Commissioner, dated December 3, 1945, fixing the opening date for shipment of Valencia oranges as of January 31, 1946; and a mandatory injunction to compel him to issue certificates of maturity and inspection based upon what was known to the industry as a "composite test" of such fruit. McDonald filed a plea of privilege to be sued in Travis County. The transcript contains no order of transfer, but the cause was tried to the Travis County District Court, without a jury, and the appeal is from its judgment. We presume that a proper order of transfer was made. The trial court set aside the December 3rd directive and enjoined its enforcement; and granted the mandatory injunction prayed for; hence this appeal.

It is conceded that in so far as the directive is concerned, that issue has become moot and need not be further considered. The injunction involved depends upon a proper construction of the statutes regulating the sale and shipment of citrus fruit.

These statutes were enacted as public health measurers, are penal in character, and are published in Vernon's Ann. P.C., as Arts. 719a, 719b, and 719c—1, with numerous subdivisions thereunder. The original law was enacted in 1927, Acts 40th Leg. 1st C.S., Ch. 88, p. 240, amended in 1929, Acts 41st Leg.Reg.Sess., Ch. 288, p. 636, and rewritten in 1931, Acts 42nd Leg.Reg.Sess., Ch. 244, p. 406. The latter act is carried as Art. 719a, V.A.P.C. No material changes in its provisions were made until 1939 when the Legislature enacted what is referred to as the "Color-Added Law," regulating the use of artificial coloring of citrus fruit prior to shipping or marketing. See V.A.P.C. Art. 719c—1. The 1939 Act is largely supplemental to the 1931 Act, but as to oranges it requires, as a prerequisite to authority to sell a 9 to 1 ratio of soluble solids to anhydrous citric acid for color added oranges; whereas an 8 to 1 ratio is sufficient for those to which no color is added. However, no different method or standard for testing and determining the maturity of such fruit is provided in the 1939 Act from that provided

in the 1931 Act. The 1931 Act makes it unlawful, among other things, to sell, ship, or offer for sale "citrus fruit which is immature or otherwise unfit for consumption * * *." As to oranges it provides (Sec. 3) "That within the meaning and purpose of this Act, oranges shall be deemed to be mature when the juice thereof contains not less than eight per centum (8%) of the total soluble solids to each part of the anhydrous citric acid"; prescribes the test to be used in determining such ratio; and that "All citrus fruit not conforming to the above standards shall be deemed and held to be immature within the meaning of this Act." The act imposes upon the Commissioner of Agriculture the duty of applying and enforcing the law and Sec. 3a authorizes him to "prescribe additional seasonal requirements from time to time to the end that citrus fruit shall at all times be fit for human consumption before being offered for sale." Between September 1st and December 15th the inspections provided for to determine maturity are to be made in the grove. Between December 16th and August 31st of the following year, such inspections may be made after the fruit has been gathered. The method of inspection prescribed by the statute is:

"In the inspection of the citrus fruit in the grove as is provided herein, inspectors shall take samples for analysis from the trees and from such fruit in the area for which inspection is requested, in the presence of the owner or agent or representative of such owner of such grove. Sufficient samples of grapefruit or oranges, each fairly representative of such of the fruit for which clearance certificate is desired shall be drawn by the inspector, witnessed by the owner, agent, or owner's representative. For such fruit as passes the required test the Commissioner of Agriculture shall issue his certificate of clearance permitting such fruit to be removed and offered for sale; provided, however, that where the Commissioner of Agriculture or State Inspector has reason to believe that immature and green fruit is in fact being offered for sale, such immature or green fruit shall be condemned and it shall be unlawful for any person willfully to substitute green fruit for ripe fruit for which a clearance certificate has been issued; and for the determination of whether any such substitute has in fact taken place the Commissioner of Agriculture shall have the right and is herein fully empowered to test at the packing shed or elsewhere any fruit being offered for sale or for shipment."

The record shows that the usual, if not uniform, method of gathering such fruit for marketing is to "clean the tree." That is, remove all fruit from the tree at one picking. It is then taken to the warehouse or shipping plant where it is cleaned, etc., and "color added," where that is desired. It is then screened for size and only fruit of the same size is crated together for shipment and sale. This process results in segregating of such crop into some six different sizes, and the size is designated for marketing purposes by the number required to fill a 1⅘-bushel crate. This number varies from 96 of the largest up to 250 of the smallest size; but each size is crated separately and sold separately.

The Commissioner of Agriculture took the view that each size, when marketed separately, must meet the statutory test of maturity and refused to issue certificates of maturity thereon unless and until they did meet such test. The appellees, plaintiffs below, on the other hand, contend that the statute requires and provides only for a "composite test" made from the fruit, consisting of all sizes, as taken from the grove. The trial court so held. That test is described in appellees' pleadings as follows: "Procure a fair sample of the smaller size fruit of the same variety, a fair sample of the medium size fruit of the same variety and a fair sample of the larger size fruit of the same variety or a fair sample of all sizes of the same variety and test each of such sizes for juice content and then making the composite test for ratio by pouring all the juices from the respective sizes that have been tested for juice content into one container and then testing such juice for ratio in the mode and manner prescribed by the statutes, and in all cases where the composite test meets the requirements for 'Color-Added' oranges, then issuing proper certificates on the entire lot."

Appellees contend, and numerous witnesses so testified, that the Commissioner of Agriculture had, up until December, 1945, interpreted the law as requiring only a composite test; that such test had been uniformly applied heretofore; that the entire packing and shipping industry had been built up based on such a test; and that to now meet the Commissioner's requirement of an "individual test" for each size, would be impracticable, impose prohibitive costs on growers and shippers, and resultant heavy economic losses. McDonald denied that he had placed such a construction on the statute; testified that he had always used both the "individual test" and the "composite test"; that in prior years the "composite tests" had been largely used but had been found not to be as accurate as they should be; that because of climatic conditions in 1945 Valencia oranges were later than usual in ripening and more attention had to be paid to individual tests to prevent unripened oranges being marketed.

In addition to the 1931 Act, the 1939 "Color-Added Law" clearly contemplated maturity tests of such fruits before color is added. It also provided that (Sec. 7) "The Commissioner shall have power to pass, make, and promulgate all needful rules and regulations for the proper enforcement and carrying out of this Act, and such rules and regulations, not inconsistent herewith, shall have the force and effect of law." However, the testimony shows that such fruit was not screened for sizes until after color had been added. And in view of the power given to the Commissioner to promulgate all reasonable and necessary enforcement regulations to secure compliance with such laws; the "individual" test prescribed is authorized unless it is inconsistent with those laws.

The testimony shows that the "clean the tree" method of gathering such fruit is the one uniformly used in picking it, and is, from an economic standpoint, the only practicable method of doing so. However, no material damage results either to trees or to fruit if left on the trees until all sizes are sufficiently ripened to meet the statutory test; but loss hazards on mature fruit from freeze, rain, hail, wind, falling to the ground, and destruction by predatory birds and animals, is increased the longer it is left on the trees; and is minimized by gathering such fruit at the earliest practicable date after maturity. Further, in normal seasons the Rio Grande Valley Valencia oranges ripen earlier than the same varieties do in Florida and California and earlier marketing thereof brings an enhanced price, an added incentive to gathering same as early as practicable.

All these factors are, however, economic factors. The sole factor fixed by law is whether *any* citrus fruit, regardless of size or variety, is mature and fit for human consumption, as measured by the standards fixed by law, when it is sold or offered for sale to the public. The objective of the law is the protection of the public. Sale is expressly forbidden of "*any* citrus fruit that is *immature, unripe,* overripe, frozen or frost damaged, or otherwise unfit for consumption * * *." (Emphasis ours.) The law prescribes the standards by which it is to be determined whether such law is violated. The tests are but steps in ascertaining that standard and not in modification or derogation of the forbidden acts. Such tests must, of course, be applied reasonably, and in fairness to growers and shippers; but cannot be made in such manner as to circumvent or evade the express prohibitions of the law itself against sale of unripe fruit to the public. And the sale, through a screening out process, of small oranges in separate lots, separately crated, which do not meet the statutory test of maturity, would clearly, we think, constitute a sale to the public of unripe fruit within the meaning of the law. It may be difficult, involve risks, cause losses which otherwise might not occur, or work hardships to meet the standards of maturity fixed by law; but these considerations cannot alter nor nullify its express provisions. Such concomitants are not unusual results of the regulation of any industry in the public interest.

There is nothing in the language of Sec. 12 of the inspection provision which expressly authorizes a mixture of juices from all sizes of oranges for an average overall test; and then a separation of the high content oranges for sale in one lot, and the low

content oranges for sale in another. The method of inspection prescribed rather indicates the contrary. The inspector, for purposes of such test, must take "sufficient samples * * *, each fairly representative of *such of the fruit for which clearance certificate is desired * * *."* (Emphasis ours.) It is not controverted that the oranges involved in the instant suit were crated separately according to size, and such lots sold separately according to size. Each crate contained only one size. A crate did not contain a mixture of the several sizes so that a composite or average juice content test thereof, such as is insisted upon by appellees, would pass the statutory test. If they had been so mixed and packed, then the consumer might have been compensated for the low ratio small oranges contained therein by the high ratio large oranges which would bring the average for the crate up to the statutory standard. But such dealers did not market the oranges in that manner. The large or high ratio oranges were packed and sold separately, and presumably, because of such high ratio juice content, brought higher prices. But when so segregated and assorted according to size, the 216 sizes, sold separately and in separate lots, had not in some instances sufficiently matured to meet the statutory test; and were, under the statutory definition, immature and not fit for consumption. Such sale, therefore, in separate lots to the public was expressly made unlawful; and the Commissioner was not authorized to issue certificates of maturity therefor. Under Sec. 8 of the 1931 Act it is made unlawful for an inspector to make or issue a false certificate.

Under the law, 216 sizes packed separately and sold separately in lots according to size, would clearly require a certificate. And the language of the statute requiring, for testing purposes, samples "fairly representative of *such of the fruit* for which clearance certificate is desired" must be construed to mean fair samples from the size for which the certificate is to be issued. To hold otherwise would enable such growers or dealers, through screening, after inspection, to sell to the public in size lots, as ripe oranges, fruit which the law itself defines as immature fruit. That the law expressly forbids. We conclude therefore that the Commissioner was not only not authorized to issue, but required, under a proper interpretation of the law, to deny certificates to such segregated lots and sizes of oranges offered for sale, which did not meet the statutory test. This conclusion renders unnecessary a discussion of the contention that the law, if not requiring a composite test, is at least ambiguous; and that prior construction by the Commissioner that it did provide only for a composite test should prevail. Such a construction was denied by the Commissioner. However, we think that the statute is clear, and under our interpretation of it no resort need be made to the generally accepted rule of statutory construction.

For the reasons stated the judgment of the trial court is reversed and judgment rendered for appellants.